## The Proprietors of SUDBURY MEADOWS *versus* The Proprietors of the MIDDLESEX CANAL.

In 1793 a corporation was created with power to make a navigable canal from Mer-
rimack river to Medford, and for that purpose to appropriate private property for
the public use ; and in order that no person might be damaged by their diverting
water-courses, or flowing his land, a special mode was pointed out for ascertaining
and securing payment of such damages ; and the corporation were authorized to take
a prescribed toll, as soon as the canal should be completed ; and if, in ten years,
it should not be completed so far as to be passable, the act of incorporation was to
be void. By a subsequent act the corporation were authorized to continue the
canal to Charles river. By a still later act, a further time was allowed them to
complete the canal to Charles river ; and within the extended time the canal was
opened to the public use and the toll was taken. The corporation had erected a
dam across a river, to form a feeder for the canal, and after the canal had been
open to the public use for more than twenty years, the corporation erected a new
dam just below the first one, but to a greater height, and in consequence certain
lands of individuals were overflowed and damaged. It was *held*, that there was no
limitation of time by the terms of the act, within which the power to command the
use of the river for the necessary supply of the canal, should be exercised ; that
such limitation could not by necessary implication be deemed to have taken effect
when the canal was first opened, because the necessity did not then cease ; and if
the like power was necessary to the continued use of the canal, as it was originally
made or had since been made without objection on the part of any person interest-
ed, the power also must be considered as continuing, and of the public necessity
and expediency of using this power, the corporation, by the act of the legislature,
were constituted the judge ; and consequently, that a private individual whose land
was injured by reason of the erection of the new dam, must pursue his remedy in
the mode pointed out in the act of incorporation, and could not maintain an action
at common law.

THIS was an action on the case by the plaintiffs as a corpo-
ration established by a special act passed on the 13th of Feb-
ruary, 1816. *St.* 1815, *c.* 101. The declaration contains
five counts, setting forth the cause of action in different forms,
all substantially resting on averments that the defendants erect-
ed a dam over the Concord river at Billerica, or kept up and
continued a dam at the same place, or enlarged, heightened or
made tighter and closer, a dam previously erected at the same
place ; each count averring the erection, maintenance, or
heightening and tightening of the dam to be unlawful ; by which
the meadows have been overflowed and valuable crops of grass
injured and destroyed, and thereby an action has accrued to the
plaintiffs ; and damages are claimed to the amount of the value
of the crops belonging to all the individual proprietors com-

posing the corporation. The defendants pleaded the general issue.

At the trial, before *Shaw* C. J., the plaintiffs offered to prove, 1. that the defendants' dam at Billerica was the cause of the injury done to the members of the plaintiff corporation, as described in the declaration, and also had increased the labor, difficulty and expense of removing obstructions in the river, which the plaintiffs were authorized to do by their act of incorporation.

2. That the defendants, in 1796, built a dam just above the present dam and raised the same to the height to which it was then raised, for the purpose of feeding their canal; that in 1804, they completed their canal from the Merrimack river to Charlestown, using the waters of Concord river so raised by the dam, to feed the canal; that they then opened the canal for public use, and took the toll thereon allowed by law, and have ever since kept the same open for public use and taken the toll thereon; that in 1828, they built the present dam just below the former dam, leaving the former dam where it stood before; that this new dam was built higher, tighter and broader than the old one, raising the waters of the river to a greater height at the dam and thereby in a much greater degree setting back the waters of the river and retaining the same longer upon the meadows, and increasing the difficulty and expense of cleaning the river and removing obstructions therein; and that the new dam was erected in the manner described, for the sole purpose of turning a greater quantity of water into the canal.

3. That the defendants had granted to others, since the building of their dam in 1796 and within ten years last past, the right to take water from the canal below the dam, for the purpose of driving one or more mills never belonging to the defendants, and for a sluice through which logs might be floated out of the canal into the pond of these mills, and had at other places opened sluices and waste ways in the canal, by which large quantities of the waters so taken from Concord river usually run out and are wasted, which waters so let out and wasted are taken into the canal from the river unnecessarily and are not needed for the lawful use and operation of the canal.

The defendants moved the Court to reject all this evidence

4

offered to prove damage by the flowing of the meadows, on the ground, 1. that as by the act incorporating the Proprietors of the Middlesex Canal, and the acts in addition thereto, they were authorized to open and construct a canal, and to use the water of Concord river as a feeder therefor, and to purchase, build and hold mills in connexion with the canal, they were authorized to erect the dam in question, both for the purpose of feeding the canal, and for the purpose of driving certain mills owned by them immediately below the dam, and so the dam was not an *unlawful obstruction*, within the meaning of the act authorizing the plaintiff corporation to sue ; —

2. That the remedy, if they had any, against the defendants for raising the water to feed their canal, was the statute remedy given by the defendants' act of incorporation and the acts supplementary thereto ; —

3. That the remedy of the plaintiffs, if they had any, against the defendants for raising the water to drive their mills, was upon the mill acts, so called ; — and that in either case this action would not lie.

But the plaintiffs contended, that the defendants could not justify as mill owners, because the leading and principal, if not the sole purpose of raising the dam, was to turn more water into the canal ; nor under the canal act, because their power under that had been fully executed and exhausted, and they had no longer any authority under it to increase their head of water.

Whereupon the Chief Justice proposed to instruct the jury, that if a new dam was erected for the purpose of feeding the canal, or of carrying the defendants' mills, although it was erected as late as 1826 or 1828, still that it was a work which the defendants were authorized by law to erect, that it was not an unlawful obstruction, for which the plaintiffs could maintain an action under their act of incorporation, and that the remedy of all persons sustaining damages by the dam, would be either under the canal acts, or under the mill acts.

The plaintiffs thereupon became nonsuit, subject to the opinion of the Court upon this direction and other points of law. If the Court should be of opinion that the plaintiffs were not confined to the statute remedy, under the canal acts or under

the mill acts, but might maintain an action at law, and also that the plaintiffs, as a corporation, under their act of incorporation had a legal authority to maintain this action, then the nonsuit was to be set aside and a new trial granted.

The act of June 22d, 1793, (*St.* 1793, *c.* 21,) after reciting that certain persons have petitioned to be incorporated "for the purpose of cutting a canal from the waters of Merrimack river into the waters of Medford river," enacts that certain persons named, their associates and successors, "shall be a corporation forever under the name of The Proprietors of the Middlesex Canal," and by that name may sue and be sued, and that they shall be "vested with all the powers and privileges which are by law incident to corporations of a similar nature"; and "whereas it may be necessary in the prosecution of the foregoing business, that the property of private persons may (as in the case of highways) be appropriated for the public use, in order that no person may be damaged by the digging and cutting canals through his land, by removing mills or milldams, diverting water-courses, or flowing his land, by the proprietors aforesaid, without receiving full and adequate compensation therefor," it is enacted, "that any person so damaged may apply to the Court of the General Sessions of the Peace to have a committee appointed to estimate the damage, and if aggrieved by the doings of the committee in estimating the damages, may apply to that court to determine the same by a jury, or by a second committee if the parties can agree thereon ; and that an execution may be issued against the property of the corporation or of any individual belonging thereto, for the sum adjudged in damages." The act contains a proviso, "that no part of the waters of Shawshine river shall be diverted from their natural course for the purpose aforesaid ; and that no dwellinghouse shall be removed or water-course turned or altered, whereon any mill is erected, so as to injure such mill, without license therefor" from the Court of General Sessions of the Peace ; and a further proviso, "that the waters of the Merrimack river shall not be so diverted from their natural course as to impede, or any way interrupt the water carriage down the Merrimack river to the mouth thereof." For the purpose of reimbursing the proprietors their expenses in build-

ing and supporting the dams, canals and locks, a toll is granted to them at certain rates per mile, to commence as soon as the the canal or any part of it shall be completed, and to continue forever ; provided that when forty years from the first opening of the canal are expired, the legislature from thenceforward may regulate the rate of toll. And it is further enacted, that if the proprietors shall refuse or neglect, for the space of ten years, to build and complete the canal, so as to be passable, the act shall be void.

By an additional act of February 28th, 1795, (*St.* 1794, *c.* 67,) it is enacted that the proprietors of the canal shall be empowered to render the waters of Concord river boatable, as far as Sudbury cause-way, and as much further as the same can be usefully improved for that end, and to open any canal, at any place in the county of Middlesex, that may be necessary to connect the Concord river with the Middlesex canal, for that purpose, and also to extend the canal from Medford to the waters of the town of Boston, or Charles river, in such way as to the proprietors may seem most advantageous.

By an additional act of June 25th, 1798, (*St.* 1798, *c.* 16,) the canal corporation are empowered to purchase and hold any mill-seats on the waters connected with the canal, and lands to accommodate the same, and thereon to erect mills.

An additional act of January 25th, 1800, (*St.* 1799, *c.* 35,) after reciting the representation of the corporation, that from the reservation to the government of a right, after the ex piration of forty years, to regulate the toll on the canal, great discouragements and embarrassments have resulted in the execution of that project, provides that a certain rate of toll be established to the corporation forever.

The additional act of March 2d, 1803, (*St.* 1802, *c.* 98,) enacts that the corporation shall be allowed the term of three years from the 22d of June, 1803, to complete the canal to Charles river ; and the term of six years from the same day, to render Concord river boatable and navigable, and for cutting other canals in the county of Middlesex, pursuant to the acts previously passed on that subject.

*Jan* 22d
1830.

*J. Mason, B. Rand* and *F. Dexter,* in support of the action. Whether the plaintiffs are to be restricted to the statute

remedy under the act authorizing the canal to be made, depends on the question whether the erection of the dam in the manner alleged, was lawful or unlawful. If it was unauthorized by the defendants' charter and unlawful, it was a nuisance for which an action at common law may be maintained. *Cook* v. *Leonard*, 6 Barn. & Cressw. 353; *Smith* v. *Shaw*, 5 Man. & Ryl. 225; *S. C.* 10 Barn. & Cressw. 277; *The King* v. *Hungerford Market Co.* 3 Nev. & Man. 622; *The King* v. *Hungerford Market Co.* 2 Nev. & Man. 340. Power was granted to the defendants to make a canal from Merrimack river to Charles river, and this power having been once executed, it was exhausted. *Strachey* v. *Turley*, 11 East, 200; *Oliver* v. *Collings*, 11 East, 367, and cites 8 East, 54; *Henfree* v. *Bromley*, 6 East, 310. Whether it was perfectly executed, is not material; it is sufficient that it was effectually executed, according to the discretion of the defendants at the time. When they took toll on the whole line of the canal, they thereby declared that the work was completed. The canal was opened to the public in 1804, and had been in successful operation until 1826, when this new dam was built. Had the work, soon after it was put in use, proved to be a failure, the defendants might probably have gone on at once and made it effectual; but there was no failure in the construction; and after an acquiescence in the state of the canal for more than twenty years, and long enough for the abutters to acquire rights by adverse enjoyment, they undertake anew to appropriate private property. If they have power forever thus to control all the private property in the neighbourhood of the canal and of the river, they have a power which the legislature never intended to grant. Nor was there any necessity for conferring on them authority so unlimited; since application might be made to the legislature for additional power, whenever a new exigency should arise. It has always been the practice of the legislature to require notice to be given to parties interested in land to be taken for public use, but here the defendants overflow a thousand acres of valuable meadow without any notice. It is said that compensation may be made for the injury done; but that is not an answer to our objections. The public exigency must require the taking of private

property, and the legislature must adjudge on the exigency·
It is too much to say that the legislature intended that a canal
should be made at all hazards and at all sacrifices ; they had
reference to such hazards and sacrifices as were apparent at
the time of the grant.    Further, the indemnity provided by
the canal act is grossly inadequate.    It is to be claimed with-
in one year ; but these meadows are twenty miles from the
dam, and the effect of the dam upon them could not be fore-
seen, nor be fully developed within that short period.    It has
been customary, of late, to say that grants of this nature are
to be construed reasonably, instead of strictly ; but the old
rule ought to be observed with a view to protect persons who
are incapable of protecting themselves.    In England this rule
has not been relaxed, but in case of ambiguity every presump-
tion is made in favor of private property.    *Shand* v. *Hender-
son,* 2 Dow, 519, 521 ; *Scales* v. *Pickering,* 4 Bingh. 448 ;
*Stourbridge Canal* v. *Wheeley,* 2 Barn. & Adolph. 792 ;
*Cockburn* v. *Harvey,* 2 Barn. & Adolph. 797 ; *Kingston up-
on-Hull Dock Co.* v. *LaMarche,* 8 Barn. & Cressw. 52 ;
*Leeds and Liverpool Canal Co.* v. *Hustler,* 1 Barn. & Cressw.
424 ; *Finch* v. *Birmingham Canal,* 5 Barn. & Cressw. 828.
Now looking at the defendants' act of incorporation, it cannot
be said that power is *plainly* conferred on them to make this
alteration.    Nothing is there said about improving, amending
or changing the canal ; and toll is to be taken, not when the
canal is " passable," but when it is " completed."    There is
in fact a limitation of time in which it is to be finished.    By
the original act, ten years only are allowed for that purpose ;
or if this admits of doubt, there is certainly a limitation in the
subsequent act of 1802, *c.* 98.    The public is interested in
knowing when it is completed and when private property is
no longer liable to be taken by the corporation, and it was
within the intention of the legislature to effect this object.    It
is said that a power to uphold the canal is implied in the au-
thority to make it ; but the power to uphold does not imply a
necessity or right to take private property for that purpose ;
neither does it imply a right to alter.    It cannot be pretended
that the defendants have a right now to vary the direction of
their canal, though originally they could adopt any line they

Sudbury
Meadows
*v*
Middlesex
Canal.

thought fit; but the same objection lies against deepening it in the manner alleged. If they alter it laterally, they take new land for excavation; if perpendicularly, they take new land by flowing. They may repair the canal, that is, restore it to its pristine form when it has suffered injury by accident or decay; 3 Poth. Pand. 2, *lib.* 39, *art.* 1, *num.* 5; 3 Poth. Pand. 215, *lib.* 43, *tit.* 19, *art.* 2, *num.* 17; but they cannot alter it. This precise point has been adjudged in the cases relating to the Glamorganshire canal. *Rex* v. *Glamorganshire Canal Co.* 12 East, 157; *Rex* v. *Justices of Glamorganshire*, 7 Barn. & Cressw. 157; *Blakemore* v. *Glamorganshire Canal*, Mylne & Keen, 154, 160, 165, 167, 173, 186; *Glamorganshire Canal Co.* v. *Blakemore*, 1 Clarke & Fenelly, 262; *S. C.* 5 Bligh, (New Rep.) 547; *Blakemore* v. *Glamorganshire Canal Co.* 2 Crompt. Mees. & Roscoe, 133; *S. C.* 1 Gale, 78; *Blakemore* v. *Glamorganshire Canal Co.* 2 New Series of Law Journal, (Chancery,) 95; *S. C.* 4 New Series of Law Journal, (Exchequer,) 146.

The remedy under the mill acts is not applicable to this case; for the jury under those acts could only determine how high the dam should be kept up for the purpose of creating and maintaining mill power; they have no right to fix the height required by the canal. Before a jury we should endeavour to prove that the increase in the height to which the water has been raised, was for the benefit of the canal, and not on account of the mills. *Coggswell* v. *Essex Mill Corp.* 6 Pick. 94.

*Hoar* and *Choate, contrà*, contended that the defendants had a right, under their charter, to make alterations in the canal from time to time as the public exigency should require; that the legislature must have foreseen that changes would be necessary; that a perpetual discretionary power must be exercised by some one, and as the legislature had not reserved it to themselves, it must be vested in the corporation; that it was the duty of the defendants to furnish the public with a suitable water communication, and this duty might be enforced by mandamus; *The King* v. *Severn and Wye Railway Co.* 2 Barn. & Ald. 646; *The King* v. *Bristol Dock Co.* 6 Barn. & Cressw. 181; that the doctrine of the present day is, that

a corporation has all the powers expressly conferred on it, and such others as are necessary to carry into effect the object of its charter; *The People* v. *Utica Ins. Co.* 15 Johns. R. 383; 1 Kyd. on Corp. 70, 71; *London* v. *Vanacre*, 1 Salk. 142; that in some cases a power is spent with the first effective exercise of it, as where a grant is made of the power to select one acre out of forty, but that this principle does not apply to a trust of a franchise, where every exercise of power is experimental and possibly of temporary expediency; that the defendants' charter receives illustration from the mill acts, under which, though a mill owner may have kept his pond at a certain height for twenty years, and the abutters have used their lands in reference to such height, he nevertheless, in order to increase the power of his mill, may raise his dam so as to overflow those lands; *Johnson* v. *Kittredge*, 17 Mass. R. 76; *Goszler* v. *Georgetown*, 6 Wheaton, 593; *Chesapeake &c. Canal* v. *Baltimore and Ohio Rail Road*, 4 Gill & Johns. 1, 90, 92, 106; *New River Co.* v. *Graves*, 2 Vern. 431; that if the defendants' power, in reference to the canal, had been previously exhausted, yet that as mill' owners they had a right to increase the height of the dam and were entitled to protection under the mill acts; that if a complaint had been brought against them under those acts, they would not have been permitted to allege in defence, that their object was to benefit the canal as well as the mills; that so far as the mills were concerned, the jury would have found no difficulty in determining that the dam was required to be of a certain height, nor in estimating the damages; that probably the improvement of the canal was the principal object in erecting the dam in question, and the benefit to the mills only incidental, but that the remedy pointed out in the defendants' charter would embrace damages caused by raising the water for either or both purposes, and if the erection of the dam was authorized by the charter, this remedy must be pursued; *Stevens* v. *Middlesex Canal*, 12 Mass. R. 466; *Sutton* v. *Clarke*, 6 Taunt. 29; *Governor &c. of Cast Plate Manufacturers* v. *Meredith*, 4 T. R. 794; *Gaby* v. *Wilts and Berks Canal Co.* 3 Maule & Selw. 580.

*Oct. 16th* · Shaw C. J. delivered the opinion of the Court. The plain

tiffs in the present case are a corporation, created by an act passed on the 13th of February, 1816.  *St.* 1815, *c.* 101. The writ embraces several counts, in which the plaintiffs declare, in various forms, that they are possessed of extensive meadows lying on both sides of Sudbury river, that they have been duly incorporated, that the defendants have erected and still maintain a dam on and across Concord river, into which the Sudbury river discharges itself, by means of which their meadows have been flooded, and crops of grass injured and destroyed.

Several questions have arisen and been somewhat discussed, namely, whether the plaintiffs have been duly constituted and organized as a corporation, whether they can sue in their corporate capacity, for damages sustained by them severally, and some others, which we have not found it necessary to decide. The main question is, whether as such corporation, supposing all other questions disposed of in their favor, they can maintain this action against the defendants, for the acts alleged to be done by them, assuming the facts to be true as averred.

By referring to the plaintiffs' act of incorporation, they are described as proprietors and owners of meadow lands situated in the towns of Sudbury and East Sudbury, which are adjoining Sudbury river, so called, from the line of the town of Framingham, to the line of the town of Concord, and which have been flowed in the summer season.  The corporation are empowered, among other things, to clear said river, by removing sand banks, bars and other natural obstructions, by cutting the grass growing in said river, whether within the limits of said towns or not ; and they may maintain an action of the case for any unlawful obstructions put in or kept up in said river, either within the limits of said towns or elsewhere.

A question arises upon this part of the act, which it may be proper to state, though it was not considered in the argument, and is not the ground of the present decision.

It is very clear that this corporation derived their whole power to sue, from this act.  The power granted is, to clear out *Sudbury river*, so called, and to sue for any unlawful obstructions in *said river*.  The question is rather one of geography than of law, what is Sudbury river ?  The statute gives no other particular designation, except " so called."  As I under-

stand it, Sudbury river flows into Concord river, and this into Merrimack river, and this into the sea. It appears by Hale's map, that the Sudbury river and the Assabet river unite together and form the Concord river. Could these plaintiffs, in their corporate capacity, under the powers granted them, sue for any unlawful obstruction in Merrimack river ? If they could not, it would be because the act confers on them no power to sue for obstructions, any where but in Sudbury river. It may be said that Concord river is only a continuation of Sudbury river with an addition of a large volume of water from other sources ; and so the Merrimack is a continuation of the same river, with further additions. *In both cases* it may be said, the reason of the law ought to extend so as to embrace obstructions in Concord river and Merrimack river, because within the same mischief. But the true answer is, that it is not embraced within the authority specifically and very definitely given by the statute. It refers by a proper name, to a local designation, well understood. The statute does not describe the lines, within which these powers may be exercised, but it refers to a well-known name by which they are defined. So in the same act, all the inhabitants in the towns of Sudbury and East Sudbury are incorporated. The lines of these towns are not described, but evidence *aliunde* must be resorted to, to ascertain where the bounds of these towns are. But the local name designates them with as much precision, as if the act itself had fully described them.

Perhaps it may be contended, that the word "elsewhere," in the last clause of the 2d section, will enlarge the powers of the corporation, and authorize them to sue for obstructions in places other than Sudbury river. But on a close examination of that clause, it will not appear to bear this construction. It gives an authority to sue for obstructions put in, or kept up, *in said river,* either within the limits of the said towns or elsewhere. The term "elsewhere," is used in contradistinction to the two towns. They are still to be obstructions *in said river,* that is, in Sudbury river. It is as if the words had been, obstructions in any part of said Sudbury river, although in a part of said river, not lying in either of the towns of Sudbury or East Sudbury. It is believed that Sudbury river, so called, extends

into Framingham above, and Lincoln and part of Concord be-
low Sudbury, and if so, the word " elsewhere " would have its
application, and would give the corporation power to sue for
obstructions in said river, either above or below the two towns
named, but without extending that power to obstructions in
Concord river.   If this is a true construction of the statute, and
if the obstruction in question was in Concord river, as averred
in the declaration, it would seem to be decisive of the present
action.

    The manifest object of this act of incorporation, was, to im-
prove the extensive meadows bordering on Sudbury river, in
which it is well known there is very little fall for a great dis-
tance, by removing all natural obstructions, and to use the aid
of the law, in causing to be removed all obstructions unlawfully
created therein by other persons, by a form of action suited to
that object.   The whole power of the plaintiff corporation, in
this respect, was, to sue for unlawful obstructions.   But if the
defendants, as proprietors of the canal, were justified in placing
the dam in question, where they did, at the time and in the
manner in which it was done, then it was not an *unlawful* ob
struction, and this action cannot be maintained.   *Stowell* v
*Flagg*, 11 Mass. R. 364 ;   *Stevens* v. *Proprietors of Middlesex
Canal*, 12 Mass. R. 466.

    By these and subsequent cases, the principle is well settled,
that where the legislature have authorized the erection of a pub-
lic work, by individuals or by a corporation, which may in its
erection or operation occasion damage to others, and have pro-
vided a specific mode of indemnity, the common law action of
the case, treating such erection as a tort, and regarding the
damage given by it as a compensation for an injury done, is
taken away.   Indeed it is scarcely contested, that for all dam-
age necessarily occasioned by the construction of the canal, in
taking land, digging the canal, raising embankments, the taking
of streams and water-courses, and the flowage of lands, if these
were done in the due exercise of the powers granted by the
act of incorporation, the party damnified must pursue the statute
remedy and cannot have an action on the case.   If this princi-
ple applies to the ordinary cases of persons damnified in their
property, by the authority of the legislature, in the exercise of

Sudbury
Meadows
*v.*
Middlesex
Canal.

the right of eminent domain, it applies *a fortiori* to the present case, where the corporation can only sue for *unlawful obstruction*. But a dam across a river warranted by a valid act of the legislature, is not an unlawful obstruction.

The question then is brought to this, whether the Proprietors of the Middlesex Canal, under their act of incorporation, and the various acts supplementary thereto, had authority to increase the height of their dam, in 1826, for the purpose of turning the water of Concord river more effectually into their canal.

The first act was passed on the 22d of June, 1793. *St.* 1793, *c.* 21. The purpose expressed in the preamble of the first section is, that of cutting a canal from the waters of Merrimack river into the waters of Medford river. No definite course, and no other *termini* are given by the act. After providing for the organization of the company, it contains a preamble, setting forth, that whereas it may be necessary in the prosecution of the business, that the property of private persons, should, as in case of highways, be appropriated for the public use, and in order that no person may be damnified by the digging and cutting canals through his land, by removing mills or mill dams, diverting water-courses, or flowing his lands, without receiving full and adequate compensation therefor ; it then goes on to provide for a special mode of ascertaining and securing payment of those damages, when the parties do not agree. The act then provides that no part of the waters of Shawshine river shall be diverted from their natural course, for the purpose aforesaid ; also, that no dwellinghouse shall be removed, and no water-course turned, on which a mill is erected, without a license therefor from the Court of Sessions, with a further proviso, that the waters of Merrimack river shall not be so diverted as to impede the water carriage down the Merrimack river.

Sect. 7th provides for a toll, to commence on the canal, as soon as the same or any part thereof shall be completed ; and sect. 8th provides, that if the proprietors refuse and neglect, for ten years, to build and complete such canal, so as to be passable, the act shall be void.

Several other acts were passed, giving additional powers, as, to make other canals, to render Concord river boatable, to extend the canal to Charles river, and the like, but not bearing

upon the present question. See *St.* 1794, *c.* 67 ; 1798, *c.* 16 ; 1799, *c.* 35 ; 1802, *c.* 98 ; 1807, *c.* 2 ; 1809, *c.* 19 ; 1810, *c.* 53 ; 1812, *c.* 112 ; 1812, *c.* 115 ; 1814, *c.* 100. By the statute of 1798, *c.* 16. the proprietors were authorized as a corporation, to purchase and hold mill seats, and erect mills on the waters connected with the canal.

The original act upon which the question mainly depends, is somewhat loosely and inartificially drawn. It was passed at a time when the legislature had little experience upon similar subjects ; and it is highly probable that at the present time a similar act would be much more carefully guarded. It is quite manifest that the legislature regarded this canal as a great public improvement. of the highest utility, and they intended to give all the powers necessary to its accomplishment. But as it could not be known, what powers would be necessary, they were given to the corporation in broad and general terms. That the legislature intended to exercise the right of eminent domain to the extent necessary to accomplish the enterprise, is manifest from the preamble, which sets forth the necessity of appropriating private property to this purpose, and providing a constitutional and adequate compensation. The powers to take property are not specially enumerated, but they are sufficiently designated in the act, taking the different parts together.

The least doubtful of those powers, is that which authorizes the appropriation of water-courses, and, as a necessary consequence, the flowing of lands. The existence and use of a navigable canal, implies that it is to be filled and supplied with a sufficiency of water. But, in addition to this necessarily implied authority, the power is given in terms, sufficiently intelligible. The power intended to be granted, may be inferred from the exceptions. The proprietors of the canal are not to take the waters of the Shawshine river, and this is the only absolute exception. Further, no mill stream is to be taken on which a mill is actually erected, without a license from the Court of Sessions, which license they are specially authorized to grant. These provisions clearly imply that any other mill streams may be appropriated without a license, and that all mill streams may be so, under such license. That such a power may be invested by the legislature, in a public company

incorporated and organized for that purpose, seems to have been too long and uniformly practised ever since the adoption of the constitution, to be now drawn in question.

It seems therefore now scarcely open to a question, that if the act complained of by the plaintiffs had been done seasona bly after the grant of the charter, and in connexion with the original works, it would have been within the scope of their authority. But it is contended that when the canal was completed and the proprietors began to take toll, their power to take property and do acts, which would directly or indirect ly do damage to the property of others, was at an end, and that all such acts, from and after such time, must be deemed unlawful and treated as nuisances and torts, to be redressed by an action sounding in damages, or by an actual abatement by the party damnified. This must depend upon the question, whether there is any limitation of time, express or implied, within which the power was to be exercised.

It was contended that an express limitation is found in the last section, which enacts that if the proprietors shall refuse or neglect, for the space of ten years, to build and complete such canal, so as to be passable, then the act shall be void. But this provision was obviously made *alio intuitu*, to secure the benefit of the public, contemplated by the act, within the time. If so far made and completed as to be *passable* within the time, the act should not be void, but all its powers continued. Suppose the plan of the canal contemplated a high embankment, and they had authority to make it, but as it would take a long time to accomplish it, a temporary trunk or aqueduct is substituted, so as to be passable within the ten years ; might not the embankment be afterwards made and the powers necessary to accomplish it exercised for that purpose ? So some of the supplementary acts provide, that the proprietors shall have *further time* to do certain things, thereby implying that but for such extension, the limitation would take effect ; but these, it is believed, will all be found to apply to the further and additional works which they are authorized to undertake, such as extending the canal to Charlestown, making Concord river boatable, improving Merrimack river, and the like. The Court are therefore of opinion, that the ten years did not apply as a

limitation for the exercise of powers *under* the act, supposing the act to continue in force, and that there is not in any of the statutes, any express limitation of time, for the exercise of this power.

Then the question is, whether there be any limitation of time, for the exercise of this power of taking water-courses for feeders, by necessary implication. No question necessarily arises here as to the power of altering or changing the line or course of the canal, so as to take other land, or of widening or deepening the canal, essentially changing its structure, so as to require a larger volume of water. The question is, as to the right to take more water, upon the principal and main feeder, on the summit level, for supplying the canal, as it was originally made, or as it has been made without objection on the part of any party interested If there be any such limitation by implication, it must arise from the subject matter ; and it must be inferred as the understanding of the legislature, that after such limited period, this power would be no longer necessary to accomplish the object contemplated, and therefore that it was not intended to confer the power. But if it can be reasonably inferred, that such power might be necessary, though perhaps to a very limited extent; so long as the canal should remain, it must be inferred that the necessary power was to be co-extensive with it. And it seems to us, that though the bulk of the damage by taking lands, flowing lands, disturbing water-courses and the like, was contemplated to be sustained in the outset, yet if in providing for the actual navigation and beneficial use of the canal in future, some measures would be necessary, which might cause damage to individuals, all the reasons of justice, expediency and public policy, which would warrant the use of such means, and require the persons thus damnified, to resort to their statute remedy, and bar a common law action in the first instance, would apply to such case.

The great object of the act was, to establish a canal for public use, to be perpetual. It was alike necessary to the interests of the public and the proprietors, that it should be perpetually supplied with water ; and without such supply it would be without profit to the proprietors or benefit to the public. It might well be anticipated, that by the increased

transportation on the canal, and the increased use of water therefor, or by the drying up of streams originally used as feeders, from natural causes, the supply from the original sources would become insufficient. In that event, it would be necessary to take other water-courses within the scope of the original grant, or to take an enlarged quantity of water from those already used, and thereby to flow other lands, and, being necessary, it was comprehended within the grant. At least we think, that this reasoning is sufficient to show, in the absence of any express limitation in the act, that it cannot be inferred from the nature and purposes of the enterprise, that this power was limited by implication, to the time when the canal should first be opened for use, and when the proprietors should begin to take toll. If then the power was originally well given, and there was no express or implied limitation of time, within which it should be exercised, the act of the defendants was lawful, and the party damnified has the same remedy, as if such feeder had been originally used. It is said in argument, that in case of such necessity, the company might apply to the legislature for additional powers. It is true they might; but the legislature might not grant them. Other public improvements might take their place in public estimation and favor, other views of policy might prevail; and the company as originally constituted, might not incline to expend their capital upon a hazardous enterprise, intended mainly for the public benefit, without having in the outset all the powers necessary to the accomplishment of the object, and sufficient to ensure their own fair remuneration. An instance occurs in the series of acts cited. The original act provided, that after the expiration of forty years, the legislature might regulate the tolls. But within seven years, an act passed, reciting that from this reservation of power on the part of the legislature; great discouragements and embarassments had resulted in the execution of the project, and therefore the reservation was relinquished and the grant of a fixed toll was made absolute and perpetual.

On the whole, the Court are of opinion that the raising of the dam on Concord river, as a feeder for the canal, was an act which the defendants, by their act of incorporation, were origin-

ally authorized to do although it might cause some damage to the land of others ; that there was no limitation of time by the terms of the act, within which the power to command the use of water-courses for the necessary supply of the canal should be exercised ; that such limitation, of the power thus to take and appropriate water-courses, cannot by necessary implication, be deemed to have taken effect, when the canal was first opened, because the necessity did not then cease ; but, if the like power was necessary to the continued use of the canal, for the purpose of navigation, the power must be considered as continuing also, and of the public necessity and expediency of using this power for the public benefit, the company, by the act of the legislature, were constituted the judges.

Should the party complaining, set out in his declaration, and maintain by his proof, that a work had been raised wantonly or maliciously, or colorably under pretence of accomplishing the purposes of their charter, but really with another and different purpose, it might present a very different question. But as they have authority to do the act complained of, for a proper purpose, of which they are made judges, such purpose is to be presumed until a contrary is shown.

The Court are of opinion that the action cannot be maintained, and that there must be

*Judgment on the nonsuit*